**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 22-5238(L), 22-5244, 22-5245, 22-5246**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MAINE LOBSTERMEN'S ASSOCIATION,

*Plaintiff-Appellant*,

STATE OF MAINE DEPARTMENT OF MARINE RESOURCES; MASSACHUSETTS LOBSTERMEN'S ASSOCIATION; DISTRICT 4 LODGE OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKS; LOCAL LODGE 207,

*Intervenors-Appellants*,

v.

NATIONAL MARINE FISHERIES SERVICE; GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS SECRETARY OF COMMERCE; JANET COIT, IN HER OFFICIAL CAPACITY AS ASSISTANT ADMINISTRATOR FOR FISHERIES,

*Defendants-Appellees*,

CONSERVATION LAW FOUNDATION; CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the District of Columbia, No. 1:21-cv-02509-JEB

## BRIEF FOR APPELLANT MAINE LOBSTERMEN'S ASSOCIATION

MARY ANNE MASON
Chief Legal Officer
MAINE LOBSTERMEN'S ASSOCIATION
2 Storer St., Suite 203
Kennebunk, ME 04043

JANE C. LUXTON
LEWIS BRISBOIS BISGAARD & SMITH
2112 Pennsylvania Ave., Suite 500
Washington, DC 20037

PAUL D. CLEMENT
 *Counsel of Record*
ANDREW C. LAWRENCE*
JAMES Y. XI*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
*Supervised by principals of the firm who are members of the Virginia bar

*Additional Counsel Listed on Inside Cover*
*Counsel for Plaintiff-Appellant*

November 9, 2022

RYAN STEEN
JASON MORGAN
JAMES FELDMAN
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Maine Lobstermen's Association certifies that it does not have a parent corporation and that no publicly held corporation owns more than 10% of its stock.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici.

Plaintiff-Appellant in this case is the Maine Lobstermen's Association (MLA). The Defendants-Appellees in this case are the National Marine Fisheries Service, Gina Raimondo (in her official capacity as Secretary of Commerce), and Janet Coit (in her official capacity as Assistant Administrator for Fisheries) (collectively, NMFS). The state of Maine's Department of Marine Resources, the Massachusetts Lobstermen's Association, and the District 4 Lodge of the International Association of Machinists and Aerospace Workers, Local Lodge 207 intervened on behalf of MLA in the district court and are also Appellants in this appeal. The Conservation Law Foundation, the Center for Biological Diversity, and the Defenders of Wildlife intervened on behalf of NMFS in the district court and are also Appellees in this appeal. No other parties, intervenors, or amici appeared before the district court. The state of New Hampshire has filed a statement of intent to file an amicus brief in support of Appellants in this Court; no additional intervenors or amici have appeared in this Court.

## B. Ruling Under Review.

The ruling under review is the district court order and accompanying memorandum opinion granting Appellees' cross-motions for summary judgment and denying Appellants' motions for summary judgment. Judge James E. Boasberg of the U.S. District Court for the District of Columbia issued both the order and the

memorandum on September 8, 2022.  The order is entry 75 on the district court docket and is located on pages A208-09 of the appendix.  The opinion is entry 76 on the district court docket and is located on pages A210-42 of the appendix.  The Westlaw citation for the opinion is 2022 WL 4392642.

### C.    Related Cases.

This case has not previously come before this Court, nor has it come before any other court (other than the district court).  The U.S. District Court for the District of Columbia is currently considering *Center for Biological Diversity v. Raimondo*, No. 18-cv-112, a case that involves substantially the same parties and a challenge to the same biological opinion issued by NMFS.  Counsel is not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............. ii

TABLE OF AUTHORITIES.................................................................... vi

GLOSSARY OF ABBREVIATIONS ........................................................ xi

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ........................................................... 5

STATUTES AND REGULATIONS .......................................................... 5

STATEMENT OF THE ISSUES ............................................................. 5

STATEMENT OF THE CASE................................................................. 6

    A.    Legal Framework .............................................................. 6

    B.    Factual Background........................................................... 11

    C.    Procedural History............................................................ 20

SUMMARY OF ARGUMENT................................................................ 23

STANDARD OF REVIEW ................................................................... 27

ARGUMENT ................................................................................... 27

I.    NMFS' Approach Of Giving The "Benefit Of The Doubt" To The Species And Assessing "Worst Case Scenarios" Contravenes The ESA And Its Implementing Regulations........................................ 27

    A.    Section 7(a)(2) of the ESA and Its Implementing Regulations Require Agencies to Assess the Best "Data" Available to Determine What is "Likely" to Occur to the Species, Not to Skew the Evidence and Mitigate the Most Unlikely Scenario Imaginable ..................................................................... 28

    B.    The District Court Abdicated its Duty to Interpret the Law .............. 40

II.      NMFS Lacked Authority To Incorporate Its Draconian Conservation Framework Into The Proposed Agency Action .............................................. 45

     A.     NMFS Unlawfully Circumvented the ESA's Meticulous Scheme for Imposing Conservation Requirements ........................... 45

     B.     The District Court's Contrary Conclusion Is Wrong ......................... 50

III.     The Court Should Order A Remand To NMFS Without Vacatur ................. 53

CONCLUSION ......................................................................................... 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016)..................................................................................29

*Arizona v. Thompson*,
281 F.3d 248 (D.C. Cir. 2002) ...............................................................................27

*Bennett v. Spear*,
520 U.S. 154 (1997)............................................ 5, 8, 11, 34, 40, 45, 48, 49, 51

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984)...............................................................................................39

*Ctr. for Biological Diversity v. Raimondo*,
No. 18-112 (JEB), 2022 WL 2643535 (D.D.C. July 8, 2022)..........................21

*Ctr. for Biological Diversity v. Ross*,
No. 18-112 (JEB), 2020 WL 1809465 (D.D.C. Apr. 9, 2020)..........................21

*Ctr. for Biological Diversity v. Ross*,
No. 18-112 (JEB), 2020 WL 4816458 (D.D.C. Aug. 19, 2020).......................21

*Defs. of Wildlife v. Gutierrez*,
532 F.3d 913 (D.C. Cir. 2008) ...............................................................................13

*Doe, 1 v. FEC*,
920 F.3d 866 (D.C. Cir. 2019) ...............................................................................42

*Dow AgroSciences LLC v. NMFS*,
707 F.3d 462 (4th Cir. 2013)..................................................................................46

*Epic Sys. Corp. v. Lewis*,
138 S.Ct. 1612 (2018)..............................................................................................38

*FCC v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003)................................................................................................42

*Fogo De Chao (Holdings) Inc. v. DHS*,
769 F.3d 1127 (D.C. Cir. 2014)..............................................................................27

*Holland v. Nat'l Mining Ass'n*,
   309 F.3d 808 (D.C. Cir. 2002) ........................................................42

*In re Polar Bear Endangered Species Act Listing
   & Section 4(d) Rule Litig.—MDL No. 1993*,
   709 F.3d 1 (D.C. Cir. 2013) ...........................................................29

*Miccosukee Tribe of Indians of Fla. v. United States*,
   566 F.3d 1257 (11th Cir. 2009) ....................................................38

*Mil. Toxics Project v. EPA*,
   146 F.3d 948 (D.C. Cir. 1998) ......................................................42

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).........................................................................27

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ......................................................28

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007)............................................................. 10, 27, 42

*Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) .................................................. 27, 42

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
   142 S.Ct. 661 (2022)................................................................ 45, 51

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
   898 F.2d 1410 (9th Cir. 1990)..........................................................8

*Roosevelt Campobello Int'l Park Comm'n v. EPA*,
   684 F.2d 1041 (1st Cir. 1982) ..................................................... 8, 33

*Scheduled Airlines Traffic Offs., Inc. v. Dep't of Def.*,
   87 F.3d 1356 (D.C. Cir. 1996) ......................................................41

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
   992 F.3d 1071 (D.C. Cir. 2021) ....................................................46

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ........................................................53

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012)........................................................................29

*TVA v. Hill*,
437 U.S. 153 (1978)............................................................ 7, 33, 48

*U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*,
852 F.3d 1131 (D.C. Cir. 2017)......................................................28

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
141 S.Ct. 777 (2021)......................................................................10

*U.S. Sugar Corp. v. EPA*,
844 F.3d 268 (D.C. Cir. 2016) .......................................................53

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .....................................................53

*West Virginia v. EPA*,
142 S.Ct. 2587 (2022).............................................................. 39, 50

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004)..........................................................46

**Statutes**

5 U.S.C. §551 ...................................................................................42

5 U.S.C. §706.......................................................................... 27, 41, 42

12 Me. Stat. tit. 12, §6431-E ............................................................12

12 Me. Stat. tit. 12, §6431-G ............................................................12

16 U.S.C. §1362 ...............................................................................15

16 U.S.C. §1387 ...............................................................................13

16 U.S.C. §1532 .................................................................................6

16 U.S.C. §1533 .................................................................................6

16 U.S.C. §1536..................... 1, 7, 8, 9, 10, 29, 31, 33, 43, 45, 46, 47, 48, 49, 50, 51

16 U.S.C. §5101 .......................................................................................11

28 U.S.C. §1291 .........................................................................................5

28 U.S.C. §1331 .........................................................................................5

28 U.S.C. §1346 .........................................................................................5

Pub. L. 93-205, Dec. 28, 1973, 87 Stat. 884 ...................................... 7, 33

Pub. L. 95-632, Nov. 10, 1978, 92 Stat. 3751 ....................... 7, 33, 34, 48

Pub. L. 96-159, Dec. 28, 1979, 93 Stat. 1226 ........................................7

**Rules**

Fed. R. App. 4 ...........................................................................................5

Fed. R. App. P. 28 .....................................................................................6

**Regulations**

50 C.F.R. §17.11 ................................................................................ 6, 13

50 C.F.R. §17.12 .......................................................................................6

50 C.F.R. §216.3 .....................................................................................15

50 C.F.R. §229.32 ...................................................................................13

50 C.F.R. §402.01 .....................................................................................7

50 C.F.R. §402.02 ....................................... 8, 9, 10, 30, 40, 46, 47

50 C.F.R. §402.14 ....................................... 8, 9, 10, 30, 46, 47

50 C.F.R. §402.17 ....................................... 9, 30, 32, 44

62 Fed. Reg. 39,157 (July 22, 1997).......................................................13

72 Fed. Reg. 57,104 (Oct. 5, 2007).........................................................14

73 Fed. Reg. 51,228 (Sept. 2, 2008) .......................................................14

84 Fed. Reg. 44,976 (Aug. 27, 2019) ....................... 9, 30, 32, 37, 38, 43

86 Fed. Reg. 51,970 (Sept. 17, 2021) ............................................................... 15, 20

**Other Authorities**

*Black's Law Dictionary* (5th ed. 1979) .............................................................. 29, 31

David Stromberg, *The Endangered Species Act Amendments of 1978:
A Step Backwards?*, 7 Boston College Envt'l Aff. L. Rev. 33 (1978)................33

Dkt.228, *Ctr. for Biological Diversity v. Raimondo*,
No. 18-112 (D.D.C. filed Sept. 19, 2022).................................................... 20, 53

H.R. Conf. Rep. No. 96-697 (1979)........................................................... 16, 33, 37

H.R. Rep. No. 95-1625 (1978)..........................................................................7

J.B. Ruhl, *The Battle over Endangered Species Act Methodology*,
34 Envtl. L. 555 (2004)................................................................................37

J.B. Ruhl, *The Endangered Species Act's Fall from
Grace in the Supreme Court*, 36 Harv. Envtl. L. Rev. 487 (2012) .............. 33, 37

John Earl Duke, Note, *Giving Species the Benefit of the Doubt*,
83 B.U. L. Rev. 209 (2003)...........................................................................33

NOAA Fisheries, *What is the Endangered Species Act?*
(last visited Nov. 9, 2022), https://bit.ly/3eDiyGB................................................7

**GLOSSARY OF ABBREVIATIONS**

| Abbreviation | Definition |
|---|---|
| A | Appendix |
| APA | Administrative Procedure Act |
| Dkt. | District court docket |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| NMFS | National Marine Fisheries Service |

**INTRODUCTION**

The National Marine Fisheries Service (NMFS) has mistakenly put the Endangered Species Act (ESA) on a collision course with the iconic, centuries-old lobster industry in Maine. Nothing in the ESA, properly interpreted, requires this economic and cultural disaster. Under the ESA, every federal agency must ensure that any proposed agency action "is not likely to jeopardize" an endangered species "us[ing] the best scientific and commercial data available." 16 U.S.C. §1536(a)(2). The statute thus requires realistic assessments based on the best available data, not worst-case scenarios based on skewed data gerrymandered to resolve every doubt in favor of the species and against the industry. NMFS openly embraced the latter approach, and the decision below endorsing it cannot be allowed to stand.

The problems in this case begin (but certainly do not end) with the fact that NMFS is both the proponent and adjudicator vis-à-vis the agency action underlying this case. In the typical case where a federal agency wants to authorize action that implicates endangered marine species, that agency must consult NMFS, which in turn must issue an opinion—known as a "biological opinion"—that contains a determination as to whether jeopardy is likely or not. NMFS also may suggest conservation requirements in the biological opinion, but only under certain conditions. Here, however, NMFS is the proponent agency and must consult with itself. Perhaps because of the artificiality of that dynamic, NMFS short-circuited the

process by baking into the proposed action draconian conservation requirements that will imperil the lobster industry.

The endangered species that is implicated here is the North Atlantic right whale. Although few Maine lobstermen have ever seen a right whale, Maine's lobster industry has worked for decades with NMFS to ensure that lobstering gear does not pose a material risk of entanglement or other harm to the right whale. Those efforts have worked: No documented entanglement of a right whale in Maine lobstering gear has occurred *in nearly 20 years*; and there is no documented example of Maine lobstering gear *ever* seriously injuring a right whale.

Recently, however, oceanographic changes have caused the right whale's primary food source to move farther north (into Canadian waters), and Canadian fishing gear and vessels have killed or seriously injured a significant number of right whales. In 2017 alone, over a dozen right whales were killed or seriously injured in Canada, leading NMFS to declare an "unusual mortality event" and prompting Canadian officials to institute a host of protective measures. In light of that unusual mortality event, NMFS reinitiated the ESA consultation process to determine whether it could continue to authorize the American lobster fishery.

That ESA consultation process went off the rails. Relying on a handful of words of legislative history from 1979, NMFS decided that it would give the "benefit of the doubt" to the right whale by resolving all uncertainties "in favor of the species"

and using only those "metrics representing the worst case scenario"—which NMFS itself described as "very likely" to never occur, as is true of most worst-case scenarios. A804, 926. As expected, that radical approach projected a steadily declining right whale population—which led NMFS to develop a four-phase "conservation framework" that baked in draconian restrictions on the lobster industry in a stated effort to "meet" the purported "mandates of the ESA." A1071. That conservation framework would decimate Maine's lobster industry: It requires the American lobster fishery to "further reduce" NMFS' inflated risk of right whale entanglement over 30-fold to nearly zero by 2030—a requirement that is well-nigh impossible to satisfy for a Maine lobster fleet that, by law, is exclusively composed of small businesses with thin profit margins. A1071.

After developing a proposal using dire predictions and assuming the necessity of industry-crushing restrictions, NMFS then asked itself whether authorizing the lobster fishery *on those conditions* is likely to jeopardize the right whale. Unsurprisingly, NMFS answered its own question with a foreordained answer. It concluded that a lobster fishery in which lobstermen must take the most extreme precautions possible to avoid hypothetical worst-case scenarios that err on the side of the species at every turn is not likely to jeopardize the right whale. NMFS then issued a final rule implementing the first phase of the conservation framework, and that rule alone is estimated to impose tens of millions of dollars in compliance costs

on Maine's lobster industry. NMFS is now proceeding to accelerate the second and third phases of the conservation framework to implement even more punishing measures that will all but eliminate the lobster fishery as we know it today. And to add insult to irreparable injury, NMFS conceded that even full compliance with the conservation framework's restrictions will do absolutely nothing to reverse the decline in the right whale population so long as mortalities continue unabated in Canada, where NMFS has no jurisdiction.

NMFS' biological opinion, conservation framework, and final rule are flatly inconsistent with the ESA. The ESA, its implementing regulations, the statutory history, and precedent all make clear that NMFS must assess whether agency action is reasonably likely to jeopardize an endangered species after reviewing the best available scientific and commercial data—not fixate on the most unlikely scenarios after placing a thumb on the scale in favor of the species. Moreover, NMFS' novel theory that it may impose draconian conservation requirements on private industry on the front end of the ESA consultation process and before issuing a biological opinion clearly violates the statute's procedural requirements, elides any meaningful inquiry into whether the conservation requirements are necessary or feasible, and reflects a virtually limitless view of its power.

Reversal of the decision below is plainly warranted given NMFS' interrelated legal errors, but reversal is imperative given the real-world impact of those errors.

Since the 1800s, Maine's lobster industry has served as a cornerstone of the state's economy and identity. Indeed, today, Maine's lobster industry brings in hundreds of millions of dollars in revenue each year, supports thousands of jobs, and single-handedly sustains dozens of coastal communities in the Nation's most rural state. The Supreme Court has already held—unanimously, no less—that a central purpose of the ESA provision at issue "is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997). This Court should heed that admonition and preserve a national icon.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1346. That court issued its decision and final judgment on September 8, 2022, *see* Dkt.75-76, and MLA timely filed a notice of appeal on September 13, 2022, *see* Dkt.77; Fed. R. App. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1291.

## STATUTES AND REGULATIONS

Relevant statutory and regulatory provisions are set forth in an addendum to this brief.

## STATEMENT OF THE ISSUES

1. Whether NMFS' biological opinion, conservation framework, and final rule are inconsistent with §7(a)(2) of the ESA and its implementing regulations because the agency relied on exceedingly unlikely "worst case scenarios" to the right

whale after applying a substantive presumption "in favor of the species" instead of assessing likely scenarios using the best scientific and commercial data available.

2.      Whether the ESA authorized NMFS to incorporate draconian and untested conservation restrictions into its proposed agency action to avoid the effects of "worst case scenarios" to the right whale before seeking a biological opinion on whether authorizing the American lobster fishery is likely to jeopardize the right whale.

3.      Whether NMFS acted arbitrarily or capriciously in assessing and applying the best scientific and commercial data available.[1]

<strong>STATEMENT OF THE CASE</strong>

**A.      Legal Framework**

Congress enacted the ESA in 1973 and directed the Secretaries of Commerce and the Interior to maintain "a list of all species determined by [them] to be endangered species and a list of all species determined by [them] to be threatened species." 16 U.S.C. §1533(c); *see also id.* §§1532(6), (20); 50 C.F.R. §§17.11-17.12. The Secretary of Commerce has delegated her responsibility for administering the ESA to NMFS, and the Secretary of the Interior has delegated her responsibility for administering the ESA to the U.S. Fish and Wildlife Service (FWS). *See* 50 C.F.R.

---

[1] Maine's Department of Marine Resources has separately briefed this final issue. MLA adopts that brief by reference. *See* Fed. R. App. P. 28(i).

6

§402.01(b). NMFS has general jurisdiction over marine species, while FWS has general jurisdiction over freshwater fish and terrestrial species. *See, e.g.*, NOAA Fisheries, *What is the Endangered Species Act?* (last visited Nov. 9, 2022), https://bit.ly/3eDiyGB.

In its original form, §7 of the ESA required a federal agency seeking to take any "actions" (often identified as the "action agency") to "consult[]" either with NMFS or FWS (often identified as the "consulting agency") "to insure" that the proposed actions "do not jeopardize" an ESA-listed species. Pub. L. 93-205, §7, Dec. 28, 1973, 87 Stat. 884. After courts interpreted that absolutist language to require the government to halt several major projects, *see, e.g.*, *TVA v. Hill*, 437 U.S. 153, 172-73 (1978) (explaining that "[t]his language admits of no exception" and concluding that the ESA required the "halting of a virtually completed dam for which Congress has expended more than $100 million"), Congress immediately amended the ESA "to introduce some flexibility into the Act," H.R. Rep. No. 95-1625 (1978), at 3; *see* Pub. L. 95-632, Nov. 10, 1978, 92 Stat. 3751; Pub. L. 96-159, Dec. 28, 1979, 93 Stat. 1226. As relevant here, Congress amended §7 in 1979—creating a new §7(a)(2)—to require that an action agency consult with the consulting agency to "insure" only that a proposed action "is not likely to jeopardize" a listed species. 16 U.S.C. §1536(a)(2). As courts recognized, that change "softened the obligation on an agency," *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041,

1048-49 (1st Cir. 1982), and "modified [the ESA's] previous policy that species be preserved at all cost," *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1418 n.16 (9th Cir. 1990).

The 1979 amendments also provide that, when assessing whether an agency action is "likely to jeopardize" a listed species, "each agency shall use the best scientific and commercial data available." 16 U.S.C. §1536(a)(2). As a unanimous Supreme Court explained in *Bennett v. Spear*, the "obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." 520 U.S. at 176. "While this no doubt serves to advance the ESA's overall goal of species preservation," the *Bennett* Court continued, it is "readily apparent that another objective (if not the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id.* at 176-77.

The regulations implementing the ESA reflect that understanding. When developing its biological opinion, the consulting agency starts from the "environmental baseline"—that is, "the condition of the listed species … without the consequences … caused by the proposed action"—and then evaluates the "effects of the action" and the "cumulative effects" on the listed species. 50 C.F.R. §§402.14(g)(2)-(3), 402.02. The regulations define the "effects of the action" to

include "all consequences to [the] listed species … that are caused by the proposed action." *Id.* §402.02. "A consequence is caused by the proposed action if" "it is reasonably certain to occur" and "would not occur but for the proposed action." *Id.* Furthermore, the regulations define "cumulative effects" to include only those effects that are "reasonably certain to occur." *Id.* "A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available." *Id.* §402.17(a). And NMFS has explained that the phrase "clear and substantial" means "a firm basis to support a conclusion that a consequence of an action is reasonably certain to occur." 84 Fed. Reg. 44,976, 44,977 (Aug. 27, 2019). That "firm basis" "must be based on solid information and should not be based on speculation or conjecture." *Id.* While that "does not mean the nature of the information must support that a consequence must be guaranteed to occur," it does require "a degree of certitude" that it will. *Id.*

At the end of the consultation, the consulting agency issues a "written statement" called a biological opinion setting forth its opinion as to "how the agency action affects the species," 16 U.S.C. §1536(b)(3)(A)—specifically, whether the action "is likely to jeopardize the continued existence of [the] listed species," 50 C.F.R. §402.14(g)(4), (h). If the consulting agency issues a "no jeopardy" opinion, but nevertheless concludes that the proposed action will result in some "incidental taking" of the species, it "shall" provide a "written statement" known as an incidental

take statement that identifies the anticipated level of take of the listed species and enumerates "reasonable and prudent measures" to avoid and minimize the take. 16 U.S.C. §1536(b)(4)(C)(i)-(ii). Among other things, reasonable and prudent measures "may involve only minor changes" to the proposed action. 50 C.F.R. §402.14(i)(2).

If the consulting agency issues a "jeopardy" opinion, it "shall" suggest "reasonable and prudent alternatives" that are "economically and technologically feasible" and that (in the consulting agency's view) will avoid jeopardy. 16 U.S.C. §1536(b)(3)(A); 50 C.F.R. §402.02. The action agency then has the choice to "terminate the [proposed] action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. §1536(e)." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007); *see also U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S.Ct. 777, 784 (2021). And other parties can seek an exemption too. *See* 16 U.S.C. §1536(g)(1) ("A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption[.]"). The Endangered Species Committee must provide an exemption when, among other requirements, the benefits of the proposed action "clearly outweigh" the benefits of any alternatives and when the proposed action is "of regional or national significance." 16 U.S.C. §1536(h). In this way, Congress

underscored that "economic consequences are an explicit concern of the ESA." *Bennett*, 520 U.S. at 177.

### B. Factual Background

1. In addition to its responsibilities under §7(a)(2) of the ESA, NMFS is also charged with authorizing fisheries in federal waters (*i.e.*, waters more than three nautical miles from the shore) under various laws, including the Atlantic Coastal Fisheries Cooperative Management Act. *See* 16 U.S.C. §§5101-08; A599, 604. One of those fisheries is the American lobster fishery, which is particularly critical to the state of Maine.

Maine is the Nation's most rural state, with 3,500 miles of coastline and over 100 coastal communities that have few economic opportunities other than lobstering. *See* Dkt.42-2 ¶¶8-9. Lobstering has sustained Maine's coastal communities for "centuries," Dkt.42-3 ¶23, and it continues to do so today. In 2021, for instance, Maine's lobster fleet caught approximately $725 million worth of lobster, representing more than 80% of all commercial fishery landings in Maine and making the Maine lobster fishery the second most valuable fishery in the United States. *See* Dkt.42-2 ¶3. The broader lobster supply chain in Maine generates approximately $1 billion in additional revenue each year. *See* Dkt.42-2 ¶3. And lobstering also directly supports over 15,000 jobs in Maine. *See* Dkt.42-2 ¶4. Most (if not all) of those jobs are with small businesses because, by law, there is no corporate ownership

of the Maine lobster fleet; instead, every Maine lobsterman is a self-employed business owner that either works alone or with a small crew. *See* 12 Me. Stat. tit. 12, §§6431-E, G; Dkt.42-2 ¶5; Dkt.42-3 ¶7. Maine's lobstering industry is "an icon of the state of Maine" and an "integral part of the state's culture, traditions, and economy"—so much so that "[t]he future of Maine's coastal communities depends upon the continued success of the Maine lobster fishery." Dkt.42-2 ¶25.

The centuries-long success of Maine's lobster industry reflects its commitment to conservation. Maine's lobster industry long ago adopted sustainable fishing practices, *see* Dkt.42-2 ¶¶2, 20-21, and NMFS has recognized the success of those efforts, *see, e.g.*, A615 (NMFS stating in 2021: "The Gulf of Maine/Georges Bank stock is at near record high abundance, above the abundance threshold, and overfishing is not occurring."). In addition, Maine's lobster industry has implemented measures to ensure that lobstering does not negatively impact other marine species—including the North Atlantic right whale, a species whose habitat has (at least until recently) traditionally included the Gulf of Maine, among various other areas along the Eastern Seaboard and elsewhere. *See* A678 (map showing the right whale's range).

"Right whales are so named because, historically, they were considered the 'right' (correct) whale to hunt due to their close proximity to coastlines, their relatively slow speed, the prized oils they contain, and the large volume of blubber

that gives them a tendency to float when dead." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 914 (D.C. Cir. 2008). Right whales thus made prime targets for commercial whalers, and by 1935, commercial whaling had reduced the right whale population to just 100 individuals from an estimated high of between 9,000 and 21,000 in the pre-whaling era. *See* A679. Accordingly, the right whale has found itself on the endangered species list since the 1970s. *See* 50 C.F.R. §17.11.

Since the 1990s, Maine lobstermen have collaborated with NMFS and other stakeholders on the "Atlantic Large Whale Take Reduction Team" to help restore the right whale population—namely, by seeking to minimize any potential risk that lobster fishing gear may pose to the health and safety of right whales.[2] *See, e.g.*, 62 Fed. Reg. 39,157 (July 22, 1997); 50 C.F.R. §229.32. Those efforts, which included initiatives like deploying gear that allows whales to disentangle themselves more easily, successfully allowed the population to recover from the whaling-induced low abundance levels: Between 1990 and 2011, the right whale population increased by nearly 3% annually to a total of almost 500, representing a nearly five-fold increase

---

[2] NMFS established the Atlantic Large Whale Take Reduction Team pursuant to the Marine Mammal Protection Act. That statute authorizes NMFS to establish risk-reduction measures, subject to certain conditions, via "take reduction plans" with respect to marine mammals like the right whale. *See* 16 U.S.C. §1387(f). The take reduction planning process seeks to achieve "consensus" among stakeholders, and take reduction plans (and amendments to them) must go through notice and comment. *Id.* §1387(f)(7).

compared to 1935. *See* A679; *see also, e.g.*, 72 Fed. Reg. 57,104 (Oct. 5, 2007); 73 Fed. Reg. 51,228 (Sept. 2, 2008).

But between 2011 and 2019, the estimated right whale population again dipped below 400. *See* A680-81. In addition to identifying factors like unusually low calving rates, numerous scientists have attributed this recent decline to mortalities and serious injuries caused by heavier and more lethal Canadian fishing gear (for catching snow crabs) and vessel strikes in U.S. waters and Canada's Gulf of St. Lawrence—a location that the right whale is frequenting far more often today because oceanographic changes have caused right whales and their prey to move northward and away from the Gulf of Maine. *See* A1835, 1281, 1501, 1875, 1357. For example, in 2017, Canadian fishing gear and vessel strikes caused 13 documented right whale mortalities and serious injuries, *see* A2127—an unprecedented occurrence that NMFS declared an "unusual mortality event," A360. And in 2019, Canadian fishing gear and vessel strikes caused 11 more documented mortalities and serious injuries. *See* A1853, 1868, 2127. These developments led Canadian officials to impose, and to subsequently reinforce, a slew of whale-protective measures, which NMFS "believe[s]" are now "benefiting right whales." A518, 927, 1281-83, 1853, 1868.

By contrast, there are virtually no documented instances of right whale entanglement in lobstering gear associated with the American lobster fishery in

recent history. Between 2010 and 2019, only one (non-serious[3]) entanglement occurred—off the coast of Massachusetts. *See* A2127. The safety record of Maine's lobster industry is even more spotless, with no observed right whale entanglements since 2004—and no documented mortality or serious injury in recorded history. *See* A2127. And although it is not always possible to identify which specific fishery's gear is responsible for an entanglement, the broader category of U.S. trap/pot fisheries (which includes not only the lobster fishery, but also the cod, blue crab, and other fisheries) produced just one documented mortality or serious injury between 2010 and 2019—yielding a 0.1 annual rate of mortality or serious injury attributable to the U.S. trap/pot fisheries more broadly for the decade. *See* A2127. That 0.1 rate is a small fraction of the 0.8 "potential biological removal level" that NMFS has calculated for the right whale—*i.e.*, "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 86 Fed. Reg. 51,970 (Sept. 17, 2021); 16 U.S.C. §1362(20).

2. Following the 2017 unusual mortality event, NMFS' Sustainable Fisheries Division (the action agency here) reinitiated the consultation process under

---

[3] NMFS categorizes incidental injuries between fisheries and marine mammals as "serious" or "non-serious" injuries. A "serious injury" is "any injury that will likely result in mortality." 50 C.F.R. §216.3.

§7(a)(2) of the ESA to determine whether it could continue to authorize various federal fisheries, including the American lobster fishery, consistent with the ESA. *See* A599. During the consultation process, staff from NMFS' Protected Resources Division (the consulting agency here) identified a purported "need" to develop a new "conservation framework" to "further reduce" the risk of right whale entanglement—an initiative that, according to NMFS, is required to "meet the mandates of the ESA." A1071; *see also* A447. That conservation framework derives from NMFS' (mis)understanding that the ESA requires it to "resolve" all "uncertainty" in the data "in favor of the species"—that is, to give the "benefit of the doubt to the species"—and to ensure that an endangered species is not jeopardized even under an unlikely "worst case scenario." A804, 926. NMFS did not identify anything in the ESA's text that supports that view. Instead, NMFS relied on a handful of words in a single sentence in a single piece of legislative history. *See* A804 (citing H.R. Conf. Rep. No. 96-697 (1979), at 12).

Applying that skewed approach, NMFS' conservation framework starts from the premise that, contrary to the observed data, U.S. trap/pot fisheries—by far the largest component of which is the American lobster fishery—are responsible for 7.57 right whale mortalities or serious injuries each year (4.57 of them in federal waters), *see* A824. To reach that inflated figure, NMFS made several unlikely assumptions—*e.g.*, that the United States and Canada each bear 50% responsibility

for all entanglements between 2010 and 2019 in which NMFS could not assign responsibility to a particular country, even though Canadian gear is responsible for 80% of documented entanglements between 2010 and 2019 and 100% of the entanglement-caused mortalities or serious injuries between 2016 and 2019; that trap/pot fisheries must bear 100% responsibility for every entanglement between 2010 and 2018 in which NMFS could not definitively determine the gear involved, even though NMFS has documented the presence of gear from other fisheries on entangled right whales. *See* A812-14, 816-17, 2127. Missing no opportunity to overstate its analysis of human threats, NMFS adopted a nonsensical assumption that, but for man, right whales that survive the calf stage achieve immortality. *See* A819 ("Natural mortality is not included in the apportionment as there is little evidence showing this to be a cause of right whale mortality except at the calf stage.").

NMFS then "developed a population projection model to predict the female right whale population trajectory over 50 years." A924. As NMFS admitted, that model "utilized metrics representing the worst case scenario," yielding "model outputs" that "very likely overestimate the likelihood of a declining population" and that "should not be interpreted as an accurate predictor of the actual future right whale population." A926, 939; *see* A937 ("[I]t is likely that the projections underestimate the likelihood of an increasing right whale population and that the

17

actual right whale population will likely fare better than the trajectories indicate."). Among other things, NMFS' model assumed the worst-case scenarios that the recent spike in mortalities and serious injuries in Canadian waters—*i.e.*, events that NMFS itself has identified as extraordinarily unusual—will occur unabated for the next 50 years (even though NMFS "believe[s]" that recent "measures taken by the Government of Canada are benefiting right whales" now) and that the unusually low calving rates from the post-2010 period will persist for 50 years into the future as well. A518, 927. Indeed, the inputs in NMFS' model are so extreme that it projects a "97.72 percent" probability of a declining right whale population "even in the absence of the federal fisheries" altogether. A929, 934.

Having ballooned the number of mortalities and serious injuries caused by the American lobster fishery and projected the worst-case scenario for the next half-century, NMFS then developed a conservation framework for the fishery to engineer a more-than-30-fold reduction in the hypothetical "risk" of right whale entanglement, eliminating virtually all risk by 2030. *See* A1071-72. NMFS declared that it will pursue that stringent objective "through gear and operational measures" in a four-phase process over the course of the decade, in which it will seek to reduce the annual rate of mortality or serious injury first to 2.69, then to 2.61, then to 1.04, and finally to 0.136. *See* A1071, 1076-77. Although NMFS stated that, in its view, "this level of reduction … is necessary to ensure the goals of the ESA … are met,"

18

A1074, it repeatedly conceded that even these extreme measures will not reverse the decline in the right whale population if mortalities in Canada continue unabated, *see* A1099 ("[T]he NARW population is likely to decline if human-caused mortalities in Canada continue at current rates, regardless of effort in the United States."); A937 ("[E]ven with a very high level of risk reduction in the United States, the population trajectory will not increase if right whale mortalities continue to occur at current levels in Canadian waters.").

Next, rather than assess whether authorizing the existing lobster fishery would likely jeopardize the right whale, NMFS instead examined whether authorizing the lobster fishery under the draconian terms of its conservation framework would likely jeopardize the right whale—an assessment that assumed rather than tested the necessity of the crippling restrictions on the lobster fishery and elided any scrutiny into whether the restrictions are reasonable or prudent. *See, e.g.*, A605 ("The Framework" is "part of the proposed action[.]"). NMFS then provided the foreordained answer to its own question by issuing a biological opinion concluding that authorizing the lobster fishery subject to the debilitating conservation framework is unlikely to jeopardize the right whale. *See* A940.

In September 2021, NMFS promulgated a final rule implementing the first phase of the conservation framework, which required the American lobster industry to substantially reduce the risk of right whale entanglement. *See* 86 Fed. Reg. 51,970

(Sept. 17, 2021); A1116. To accomplish that objective, the rule (among other things) prohibited lobster fishing in certain prime fishing grounds off the coast of Maine during peak fishing season, and it also required lobstermen to substantially modify their gear. *See* 86 Fed. Reg. at 51,971; A823-24. It is estimated that compliance with these changes will ultimately cost Maine lobstermen tens of millions of dollars.[4] *See* Dkt.42-2 ¶12.

### C. Procedural History

The Maine Lobstermen's Association (MLA) is the oldest and largest fishing-industry association on the East Coast and represents approximately 1,000 commercial lobstermen in Maine. *See* Dkt.42-2 ¶2; Dkt.42-3 ¶3. MLA has stood at the forefront of right whale conservation efforts since the 1990s. *See, e.g.*, Dkt.42-2 ¶21; Dkt.42-3 ¶4. But seeking to prevent unnecessary and "devastating economic hardship on the more than 4,800 individually owned and operated lobster fishing vessels and the tens of thousands of jobs they support, all of which are essential to Maine's economy and irreplaceable aspects of the State's coastal and maritime heritage," A11, MLA filed this suit in September 2021 to challenge NMFS' biological opinion, conservation framework, and final rule as inconsistent with the

---

[4] NMFS recently "decided to accelerate the Conservation Framework's timeline by combining phases 2 and 3." Dkt.228 at 10, *Ctr. for Biological Diversity v. Raimondo*, No. 18-112 (D.D.C. filed Sept. 19, 2022). Thus, the destruction of the lobster industry as it has existed for centuries will occur even sooner than first projected.

ESA and as arbitrary and capricious under the Administrative Procedure Act (APA).
*See* A32-36. Three parties intervened as plaintiffs: Maine's Department of Marine Resources, the Maine Lobstering Union, and the Massachusetts Lobstermen's Association. Three other parties intervened as defendants: the Center for Biological Diversity, the Conservation Law Foundation, and Defenders of Wildlife.[5] MLA and the intervenor-plaintiffs moved for summary judgment, and NMFS and the intervenor-defendants cross-moved for summary judgment.

In the decision below, the district court awarded summary judgment to NMFS and the intervenor-defendants in a decision that sidesteps NMFS' distortions of the ESA framework and concededly deals a "weighty" blow to the "livelihood and traditions" of Maine's lobstermen. A241. The court acknowledged that MLA had made a "cross-cutting" argument that the ESA does not support the proposition that NMFS must regulate based on worst-case scenarios in which the evidence is skewed in favor of the species. A221-22. Although the court emphasized that it did "not

---

[5] These conservation groups filed a separate lawsuit to challenge the biological opinion and final rule, claiming that NMFS did not sufficiently protect the right whale. The same district court judge that rejected MLA's challenge in the decision below sided with the conservation groups in that separate suit and is presently considering what remedy to provide. *See Ctr. for Biological Diversity v. Raimondo*, No. 18-112 (JEB), 2022 WL 2643535 (D.D.C. July 8, 2022). The same judge has also sided with the conservation groups in a string of other decisions involving similar issues. *See, e.g.*, *Ctr. for Biological Diversity v. Ross*, No. 18-112 (JEB), 2020 WL 4816458 (D.D.C. Aug. 19, 2020); *Ctr. for Biological Diversity v. Ross*, No. 18-112 (JEB), 2020 WL 1809465 (D.D.C. Apr. 9, 2020).

hold that the ESA compels the agency's conservative policy towards resolving … scientific uncertainty," and although it also stated that it did not wish to "wade into" any debate about "*Chevron* deference," it nonetheless sustained NMFS' approach after declaring it not "arbitrary and capricious." A222. In the court's view, "all that the statute requires" is that NMFS' "assessments be based on the best available data," and NMFS "simply chose the more species-protective result" as a "policy" matter, so the court "need not … decide here that the agency's approach to the multiple issues in play was the only, or even the best, way of analyzing the data or resolving uncertainty." A220-22.

After concluding that NMFS' various distorted choices—*e.g.*, NMFS' decision that a worst-case scenario remains static over a 50-year time horizon—survived under "deferential" arbitrary-or-capricious review too, *see* A223-38, the district court then turned to MLA's argument that NMFS improperly defined its proposed action to include the conservation framework, *see* A238-39. The court acknowledged that the ESA generally provides two options for proposing conservation requirements: If the consulting agency issues a biological finding that the proposed agency action is likely to jeopardize an endangered species, the agency may propose "reasonable and prudent alternatives" that are "economically and technologically feasible"; alternatively, if the consulting agency issues a biological finding that the proposed agency action is not likely to jeopardize an endangered

species, the agency may propose "reasonable and prudent measures" that involve "only minor changes" and do not "alter the basic design" of the proposed action. A238. The court acknowledged that there is some "appeal" to the notion that NMFS made an "unlawful end run around" the ESA by including the conservation framework in the proposed action and before issuing a biological opinion. A239. And the court also acknowledged that the ESA places "limits on a consulting agency's" authority to impose conservation requirements. A239. But the court ultimately concluded that NMFS permissibly included the conservation framework in the proposed agency action because it did so in its capacity as the action agency, and the court could identify no limits on "how an action agency may define the scope of its proposed action." A239 (emphasis omitted).

## SUMMARY OF ARGUMENT

NMFS determined here that §7(a)(2) of the ESA required it to conduct a jeopardy analysis that gives the "benefit of the doubt" to the species and to assess the "worst case scenario" to the North Atlantic right whale that it concedes is exceedingly unlikely to occur. Unsurprisingly, the resulting analysis suggested that terminal restrictions on the American lobster fishery were necessary to avoid jeopardizing the right whale in the worst-case scenario (rather than any scenario likely to play out in the real world). In an effort to preserve the right whale even in that worst-case scenario, NMFS developed a conservation framework that requires

lobstermen to reduce the risk of right whale entanglement more than 30-fold to nearly zero in a matter of years, even though NMFS has not documented an entanglement in Maine lobstering gear in nearly 20 years. Having contrived a proposed agency action that bakes in all those worst-case scenarios and extreme restrictions to counter them, NMFS issued a biological opinion that reached the foreordained conclusion that subjecting the lobster fishery to debilitating restrictions—much like shutting it down entirely—would not likely jeopardize the right whale. Nowhere in the process did the agency ever consider whether it was necessary to jeopardize an iconic American industry in any likely real-world scenario. That profoundly skewed, industry-destroying approach is impossible to square with the ESA.

I. NMFS' understanding of §7(a)(2) is unmoored from the statute and its implementing regulations. Section 7(a)(2) requires federal agencies to assess the best available "data" to determine whether jeopardy to the species is a "likely" result of agency action. The statutory text expressly says as much. Multiple different implementing regulations do the same thing. The statutory evolution reveals that Congress changed the law to incorporate a realistic and flexible standard and to eliminate a more stringent one. And the Supreme Court has unanimously confirmed that the point of Congress' revised standard is to avoid unnecessary economic harm. Those principles suffice to dispose of this case: Relying on a sentence fragment in

decades-old legislative history, NMFS applied a "worst case scenario" approach to the §7(a)(2) inquiry and a substantive presumption that resolved all uncertainty "in favor of the species," which caused the agency to ignore likely scenarios and the best data. And NMFS' distortion of the §7(a)(2) framework and speculation about potential harm to the right whale has devastating real-world consequences, as it threatens to inflict just the sort of pointless economic harm on real families and communities in Maine that a faithful application of the ESA should avoid.

The district court nevertheless ruled in NMFS' favor in the decision below because it believed that it could sidestep the core legal question and assess only whether NMFS' approach of applying a thumb on the scale in favor of the species and focusing on the "worst case scenario" survives deferential arbitrary-or-capricious review. But assessing whether agency action is arbitrary or capricious is not the same as considering whether that action is contrary to law, and the APA imposes a nondiscretionary duty on courts to resolve questions of law. The court below thus abdicated its judicial duty.

II. NMFS lacked authority to incorporate into the proposed agency action the conservation framework's plan to force the adoption of untested fishing technology. The ESA provides two paths by which NMFS may impose conservation requirements: as "reasonable and prudent alternatives" following a jeopardy opinion or as "reasonable and prudent measures" following a no-jeopardy opinion. Here,

25

NMFS took neither path and instead arrogated to itself unbridled power on the front end to regulate the traditional American lobster fishery into near-extinction without first assessing its realistic impact on right whales. Congress did not confer such extraordinary power on NMFS, nor did it intend for NMFS to use the consultation process in this way. The fact that NMFS' theory would render core features of the statute superfluous confirms the point.

The district court agreed that the ESA restricts a consulting agency's ability to impose conservation requirements, but it rejected MLA's challenge on the theory that nothing restricts NMFS' authority to design a proposed action that baked in untested and potentially unnecessary requirements in its capacity as an action agency. That would make nonsense of the statutory scheme. If anything, the scheme should place greater limitations when the same agency is both proponent and adjudicator. More fundamentally, NMFS is a creature of statute, and no statute grants it authority to impose crippling restrictions on fisheries to avoid worst-case scenarios that the agency admits are unlikely to ever occur. Regardless, the record demonstrates that NMFS developed the conservation framework in its capacity as consulting agency, not action agency, fatally undermining the court's theory.

III. Although the ordinary practice is to vacate unlawful agency action, in certain cases, such a remedy can cause more damage. This case is one of them. The Court therefore should order a remand to NMFS without vacatur to ensure that

Maine's lobstermen and citizens do not experience any more suffering than they already have.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo* in accordance with the APA, which "requires [the Court] to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1135 (D.C. Cir. 2014); *see* 5 U.S.C. §706(2)(A). Agency action is not in accordance with law if it is "inconsistent" with applicable law. *Arizona v. Thompson*, 281 F.3d 248, 253 (D.C. Cir. 2002). Agency action is arbitrary and capricious if the agency "fails to 'comply with its own regulations,'" *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014), or if it has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

**I.     NMFS' Approach Of Giving The "Benefit Of The Doubt" To The Species And Assessing "Worst Case Scenarios" Contravenes The ESA And Its Implementing Regulations.**

Congress enacted the ESA "to protect and conserve endangered and threatened species and their habitats." *Home Builders*, 551 U.S. at 651. But

"[n]o legislation," including the ESA, "pursues its purposes at all costs." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1237 (D.C. Cir. 1996). That much is confirmed by §7(a)(2) of the ESA, which requires federal agencies to review the best scientific and commercial data and ensure only that their actions are not likely to jeopardize a listed species—not to place a thumb on the scale "in favor of the species" and to guard against jeopardy even in the most unlikely of scenarios, and surely not to plan for the extinction of a fishery before determining whether it poses jeopardy at all. A statute that required federal agencies to terminate their activities (such as by refusing to authorize activities in which private industry has engaged for centuries) merely because the worst-case scenario posed a conceivable threat to an endangered species would create economic chaos. Both NMFS and the district court failed to recognize as much, and that basic error infects the biological opinion, conservation framework, and final rule, warranting reversal of the decision below.

A. **Section 7(a)(2) of the ESA and Its Implementing Regulations Require Agencies to Assess the Best "Data" Available to Determine What is "Likely" to Occur to the Species, Not to Skew the Evidence and Mitigate the Most Unlikely Scenario Imaginable.**

1. When interpreting a statute, the "inquir[y] must begin[] with the language of the statute itself." *U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). Here, the relevant text of the ESA explains that NMFS must focus on probable scenarios as revealed by the best available data, not the most

improbable scenarios that emerge after applying a substantive presumption "in favor of the species." Two features of the statutory text confirm as much.

To begin, §7(a)(2) of the ESA provides that "[e]ach Federal agency shall, in consultation with and with the assistance of [NMFS], insure that any action authorized, funded, or carried out by such agency … is not *likely* to jeopardize the continued existence of any endangered species." 16 U.S.C. §1536(a)(2) (emphasis added). The statute does not define "likely," so its "ordinary meaning" controls. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The ordinary meaning of the term "likely" is "probable," *Black's Law Dictionary* 834 (5th ed. 1979) (*Black's*), as NMFS (and FWS) has conceded in other ESA contexts, *see Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 684 (9th Cir. 2016) ("NMFS has interpreted the term 'likely' to have its common meaning (*i.e.*, more likely than not). Indeed, most dictionaries define 'likely' to mean that an event, fact, or outcome is probable."); *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.—MDL No. 1993*, 709 F.3d 1, 14 (D.C. Cir. 2013) (similar). Accordingly, NMFS must assess likely or probable scenarios, not speculative or hypothetical or worst-case ones.

That interpretation is consistent with how the ESA's implementing regulations construe the §7(a)(2) duty. Indeed, the regulations repeatedly make clear that the relevant inquiry in the §7(a)(2) context is what is *reasonably certain* to occur

29

as a result of a proposed federal action—not what is merely conceivable or possible. More precisely, 50 C.F.R. §402.14(g) provides that, after NMFS identifies the "environmental baseline," it must "evaluate the effects of the action and cumulative effects on the listed species" and then "formulate [an] opinion as to whether the action is likely to jeopardize the continued existence of [the] listed species." 50 C.F.R. §402.14(g)(3)-(4). The "effects of the action" are then defined in 50 C.F.R. §402.02 as the effects caused by the proposed action that are "*reasonably certain to occur*." 50 C.F.R. §402.02 (emphasis added). That same regulation similarly defines "cumulative effects" as the "effects of future State or private activities … that are *reasonably certain to occur* within the action area," and it also defines "jeopardize the continued existence of" as "to engage in an action that *reasonably would be expected*" to "reduc[e] the reproduction, numbers, or distribution of that species." *Id.* (emphasis added). On top of that, another regulation—50 C.F.R. §402.17—says that "[a] conclusion of reasonably certain to occur must be based on clear and substantial information" and that NMFS is prohibited from considering consequences that are "so remote in time from the action under consultation that it is not reasonably certain to occur" and "only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur." *Id.* §402.17(a)-(b); *see also* 84 Fed.

Reg. at 44,992 (explaining that "reasonably certain to occur" establishes an even "higher threshold" and "stricter" standard than "'reasonably foreseeable'").

The second notable feature about the text of §7(a)(2) of the ESA is that it instructs NMFS to conduct the foregoing analysis after "us[ing] the best scientific and commercial *data* available." 16 U.S.C. §1536(a)(2) (emphasis added). That language carries a dose of empiricism. The ordinary meaning of "data" is "organized information" or "facts from which to draw a conclusion." *Black's* 356. Whether one calls it a "presumption," A221, an "assumption," A938-39, a "precautionary principle," Dkt.48 at 13, or something else, NMFS' approach of giving the "benefit of the doubt" to the species is plainly not "data"—let alone "the best scientific and commercial data." Indeed, giving the benefit of the doubt to one side in assembling a record would affirmatively bias the inquiry away from the best scientific and commercial data. Moreover, the use of the term "best scientific and commercial data" with reference to whether jeopardy is "likely" or "reasonably certain" to occur reinforces that the statute favors actual data concerning likely outcomes. While hard science and factual information can inform whether jeopardy is "likely" or "reasonably certain" to occur, a substantive presumption "in favor of the species" only distorts that inquiry. And combining that presumption with a focus on worst-case scenarios forces the agency to ignore some valid data and to make decisions

based on scenarios that are "very likely" to never occur, A926, as this case vividly illustrates.

Here, too, the ESA's implementing regulations are in accord. As they explain, "[a] conclusion of reasonably certain to occur must be based on clear and substantial *information*, using the best scientific and commercial data." 50 C.F.R. §402.17(a) (emphasis added). The phrase "clear and substantial" means "a firm basis to support a conclusion that a consequence of an action is reasonably certain to occur." 84 Fed. Reg. at 44,977. That "firm basis" "must be based on *solid information* and should not be based on speculation or conjecture." *Id.* (emphasis added). While that "does not mean the nature of the information must support that a consequence must be guaranteed to occur," it does require "a degree of certitude" that it will. *Id.* Hence, the regulations, just like the statute, require NMFS to make its decisions based on empirical information, not a thumb on the scale in favor of the species.

That the ESA and the implementing regulations are laser-focused on "likely" outcomes as revealed by the best available "data"—and not extreme outcomes based on a substantive thumb on the scale in favor of the species or speculation about unlikely scenarios—is no accident. To the contrary, that standard reflects a deliberate decision by Congress. As noted above, the original 1973 version of §7 of the ESA required federal agencies to "tak[e] such action *necessary to insure* that actions authorized, funded, or carried out by them *do not jeopardize* the continued

existence of … endangered species," and it said nothing about using "data"—much less the best available data. 87 Stat. 884, §7 (emphasis added). As the Supreme Court observed in *TVA v. Hill*, that language "admit[ted] of no exception" and seemingly required federal agencies to guard against even remote or speculative risks of jeopardy "whatever the cost." 437 U.S. at 173, 184. But that "decision was ridiculed by many and brought sweeping condemnations in Congress." J.B. Ruhl, *The Endangered Species Act's Fall from Grace in the Supreme Court*, 36 Harv. Envtl. L. Rev. 487, 489 (2012). Thus, in 1979, Congress "lessened th[e] standard" in §7, John Earl Duke, Note, *Giving Species the Benefit of the Doubt*, 83 B.U. L. Rev. 209, 215 (2003), "softened the obligation" on federal agencies, *Roosevelt*, 684 F.2d at 1048-49, and instructed NMFS to base its biological opinions on the "best evidence," H.R. Conf. Rep. No. 96-697, at 12. The newly created §7(a)(2) thus provided (as it still does today) that federal agencies need "insure" only that jeopardy is "not likely" based on assessment of "the best scientific and commercial data available." 16 U.S.C. §1536(a)(2).[6]

---

[6] This specific statutory change is just one of many from the late 1970s that "clearly reflect a congressional retreat from the 1973 unequivocal commitment to the continued viability of endangered and threatened species against any interference." David Stromberg, *The Endangered Species Act Amendments of 1978: A Step Backwards?*, 7 Boston College Envt'l Aff. L. Rev. 33, 35 (1978); *see* Pub. L. 95-632, §3, 92 Stat. 3751 (imposing "reasonable and prudent" requirements); *id.* §3, 92 Stat. at 3758 (requiring newly created Endangered Species Committee to grant exceptions when benefits of the action clearly outweigh the alternatives); *id.* §2, 92 Stat. 3751 (defining "critical habitat" to include only those "specific" areas

Congress also intended these amendments to the ESA to have significant consequences on the ground. As the Supreme Court unanimously recognized in *Bennett v. Spear*, one of the "objective[s]" of the revised language—"if not indeed the *primary* one"—"is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett*, 520 U.S. at 176-77 (emphasis added). Or put another way, "the 'best scientific and commercial data' provision" is "intended, at least in part, to prevent uneconomic (because erroneous) jeopardy determinations." *Id.* at 177. Accordingly, when NMFS fails to conduct an objective assessment of the data and ignores the likely outcome to the species, and when that oversight threatens to inflict catastrophic and pointless economic harm, its action is plainly contrary to the statute.

2. Applying these principles, the agency's error here is glaring. After all, NMFS concededly *never* focused on what would "likely" occur to the right whale if it continued to authorize the American lobster fishery. Instead, NMFS focused on "*worst case scenarios*" that it conceded would "very likely" *never* occur. A926,

---

"*essential* to the conservation of the species"); *id.* §11, 92 Stat. at 3766 (directing Secretary to consider "economic impact" in designating a critical habitat); *id.* (allowing Secretary to exclude areas from critical habitat designations "if he determines that the benefits of such exclusion outweigh the benefits of specifying the area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in extinction of the species").

1071, 1074.  And there is no denying that NMFS meant what it said, because the

agency repeated the same thing over and over:

- "[W]e utilized metrics representing the worst case scenario. Consequently, model outputs very likely overestimate the likelihood of a declining population."  A926.

- "[W]e assumed a worst case scenario[.]"  A927.

- "[P]rojections were generated utilizing worst case assumptions for several key variables, so these projections should not be interpreted as an accurate predictor of the actual future right whale population."  A939.

- "[I]t is likely that the projections underestimate the likelihood of an increasing right whale population and that the actual right whale population will likely fare better than the trajectories indicate."  A937.

- "[T]he assumptions may be considered pessimistic but … we need to give the benefit of the doubt to the species."  A506.

Moreover, NMFS focused on "worst case scenarios" by ignoring the "best

scientific and commercial *data*" and instead relying on a substantive thumb on the

scale "in favor of the species," which is plainly not "data."  Again, it is impossible

to interpret NMFS' action any other way:

- "[T]he uncertainty is resolved in favor of the species."  A804.

- "We generally select the value that would lead to higher, rather than lower, risk to endangered or threatened species.  This approach provides the 'benefit of the doubt' to threatened and endangered species."  A804.

- "This approach provides the benefit of the doubt to the species."  A814.

- "[W]e are giving the 'benefit of the doubt' to the species and assuming the interactions were caused by gear used in the federal fisheries in this Opinion." A821.

- "This gives the benefit of the doubt to the species by using years with a low number of births." A934.

Unsurprisingly, NMFS' focus on unlikely scenarios and its use of a thumb on the scale in favor of the species led it to embrace a host of nonsensical assumptions. NMFS assumed, for example, that the United States and Canada each bear 50% responsibility for all entanglement between 2010 and 2019 in which NMFS could not assign responsibility to a particular country, even though Canadian gear is responsible for 80% of documented entanglements between 2010 and 2019 and 100% of the entanglement-caused mortalities or serious injuries between 2016 and 2019. *See* A814-15, 820, 2127. NMFS also assumed that trap/pot fisheries must bear 100% responsibility for every entanglement between 2010 and 2018 in which NMFS could not definitively determine the gear involved, even though NMFS has documented the presence of gear from other fisheries on entangled right whales. A815-17, 820. NMFS also assumed (contrary to basic principles of mortality) that 0% of right whales die of "[n]atural" causes—*i.e.*, that right whales are immortal but for man. A819. NMFS further assumed that the unprecedented and unfavorable ocean conditions observed between 2010 and 2018 would persist unchanged for 50 years and with no ability for right whales to adapt, even though NMFS acknowledged that this assumption is "pessimistic." A506. NMFS likewise

36

assumed that mitigation measures in Canada will not benefit right whales despite NMFS' stated belief that the opposite is true. *See* A518. And NMFS also assumed that the historically low calving rates between 2010 and 2018 would continue for 50 years even though NMFS believes that it is "likely" that such an assumption is wrong. A937; *see generally* Maine.Br.

NMFS has never identified anything in the text of the ESA that supports its "worst case scenario" or "benefit of the doubt" approach—which seemingly seeks to resurrect the "ridiculed" and "condemn[ed]" *original* version of §7 of the statute. Ruhl, *The Endangered Species Act's Fall from Grace in the Supreme Court*, *supra*, at 489. In fact, the agency has already acknowledged that the statutory text is unhelpful for its position: "[N]othing in the Act specifically requires [NMFS] to utilize a 'worst-case scenario' or make unduly conservative modeling assumptions." 84 Fed. Reg. at 45,000. Nonetheless, NMFS appears to have felt compelled to apply its approach because of a "fleeting" statement, J.B. Ruhl, *The Battle over Endangered Species Act Methodology*, 34 Envtl. L. 555, 593 (2004), that appears in a House report from 1979, *see* A804, which observed that the change in language in §7—*viz.*, eliminating the phrase "do not jeopardize" and replacing it with "is not likely to jeopardize"—"continues to give the benefit of the doubt to the species," H.R. Conf. Rep. No. 96-697, at 12.

NMFS' reliance on that passing statement in 43-year-old legislative history is a complete non-starter. Most obviously, that is because "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1631 (2018); *see also Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1266 (11th Cir. 2009) (examining the legislative history that NMFS cites and explaining that "we are reluctant to read into the words that Congress has enacted as law words that it did not enact as law"). But even setting that insuperable problem aside, the legislative history does not even support a "worst case scenario" or "benefit of the doubt" approach anyway—as NMFS itself admitted three years ago. As NMFS correctly explained then, the 1979 House report "[a]t most … seems to indicate that the statutory language 'is not likely to jeopardize' continues to provide protections to listed species by requiring action agencies to insure that their actions are not likely to jeopardize listed species." 84 Fed. Reg. at 45,007. In other words, "[t]he use of the words 'benefit of the doubt to the species' in the Conference Report appears intended to provide reassurance that the statutory language, as amended, would remain protective of the species." *Id.* But the House report decidedly does not permit NMFS to focus exclusively on worst-case scenarios or resolve all uncertainties "in favor of the species" and against private industry.

To the extent that NMFS thinks that its "worst case scenario" or "benefit of the doubt" approach is entitled to deference because the agency also mentioned this

same piece of legislative history in its "1998 ESA Section 7 Consultation Handbook," *see* A524, 1925 (mentioning this Handbook), that argument goes nowhere. A snippet of legislative history remains just that whether or not it is repeated in an agency handbook. It is no match for the statutory text, and there is no textual ambiguity serving as a foothold for deference to an agency approach that is antithetical to both the statutory text and the specific aim of the statutory amendments. *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 n.9 (1984). Worse still, converting a statute designed to test proposed agency actions based on the best data to determine risk in likely scenarios into a license for the preemptive shut down of entire industries is not an interpretation entitled to deference. Congress did not authorize NMFS to shut down the entire lobster industry when it amended the ESA to avoid shutting down major projects based on trivial risks. *Cf. West Virginia v. EPA*, 142 S.Ct. 2587 (2022).

NMFS' misunderstanding of §7(a)(2) is no mere foot fault. To the contrary, NMFS' legal error undergirds the biological opinion; the biological opinion evaluates the fishery as modified by the conservation framework; and the final rule implements the first phase of the conservation framework. *See, e.g.*, A605, 1071. Thus, NMFS' legal error infects everything that the agency has touched here.

That error, moreover, has immense practical consequences. The evidence in the summary-judgment record is uncontested that, if NMFS' action is permitted to

stand, it will decimate (if not wholly eliminate) the American lobster fishery—a vitally important component of Maine's economy and a centuries-old cultural icon. Each year, Maine's lobster industry brings in hundreds of millions of dollars in revenue, supports thousands of families, and gives life to over 100 coastal communities in a state where there are precious few economic opportunities. But thanks to NMFS' conduct here, all of that is now circling the drain. That result has nothing to recommend it, especially given NMFS' concession that all of this suffering is essentially gratuitous because the right whale population *will still decline* so long as mortalities in Canada continue at current rates. *See* A937, 1099; *but see* 50 C.F.R. §402.02 ("A consequence is caused by the proposed action *if it would not occur but for the proposed action* and it is reasonably certain to occur." (emphasis added)). There is accordingly no denying that NMFS' action here is a quintessential example of precisely what the ESA precludes: the "zealous[] but unintelligent[]" pursuit of "environmental objectives" that produces "needless economic dislocation." *Bennett*, 520 U.S. at 176-77.

## B. The District Court Abdicated its Duty to Interpret the Law.

The district court rejected MLA's legal challenge only by bypassing the core legal question entirely. Although the court acknowledged that NMFS had systematically applied a "conservative," "substantive presumption 'in favor of the species'" that is not "compel[led]" by the text of the ESA, A221-22—an

acknowledgment that itself should have set off alarm bells given that NMFS concluded that the "mandates of the ESA" "*required*" what it did here, A1071, 1074 (emphasis added)—the court declined to "wade into [a] deference debate" under *Chevron* because it held that NMFS' "policy" choice vis-à-vis the data did not fail "arbitrary and capricious" review. A222.

That is not an available option. An agency is not entitled to misinterpret a statute as long as its misinterpretation is not a capricious error or its actions are reasonable under its misinterpretation. The district court must consider whether an agency acted "not in accordance with law" *and* whether it acted in an "arbitrary [and] capricious" manner. 5 U.S.C. §706(2)(A). Simply avoiding the latter in the abstract does not obviate the former. An agency can violate the law quite deliberately and systematically, as NMFS did here by applying its atextual presumption in favor of the species at every turn while considering worst-case scenarios rather than assessing likely outcomes based on the best data.

This Court has repeatedly emphasized that "not in accordance with law" and "arbitrary and capricious" are distinct standards under the APA. *See, e.g.*, *Scheduled Airlines Traffic Offs., Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996) ("The question under the APA [in this case] is not whether the Department acted arbitrarily or capriciously, … but rather whether it acted 'in accordance with … law.'"); *see also Mil. Toxics Project v. EPA*, 146 F.3d 948, 954-56 (D.C.

Cir. 1998).  And the distinction is material, especially when it comes to ascertaining the meaning of statutory language.  Assessing whether agency action is "not in accordance with law" requires a court to analyze the relevant statute or regulation on its own and, if the law is clear, to follow it without asking whether the agency's construction is arbitrary or otherwise entertaining agency requests for deference. *See, e.g.*, *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003); *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002); *see also Doe, 1 v. FEC*, 920 F.3d 866, 870 (D.C. Cir. 2019) (agency regulations are "'law' within the meaning of §706").  By contrast, "[r]eview under the arbitrary and capricious standard is deferential" to the agency from the outset.  *Home Builders*, 551 U.S. at 658.  Thus, the court's insistence that it "need not … decide … that the agency's approach … was the only, or even the best, way of analyzing the data or resolving uncertainty"—and that it could instead resolve MLA's challenge by extending "deferen[ce]" to the agency, A220—is plainly wrong and an abdication of APA duties.  *See* 5 U.S.C. §706 ("[T]he reviewing court *shall* decide all relevant questions of law, interpret … statutory provisions, and determine the meaning or applicability of the terms of an agency action," (emphasis added); *see also id.* §551(13) (defining "agency action" to include "agency rule[s]").[7]

---

[7] In all events, agency action is arbitrary and capricious if the agency "fails to 'comply with its own regulations,'" *Nat'l Env't Dev. Ass'ns Clean Air Project*, 752 F.3d at 1009, which describes NMFS' conduct here.  Indeed, the regulations (just

To the extent that the district court meant to suggest that "all that the [ESA] requires" is that NMFS' "assessments be based on the best available data" and that the agency may lawfully apply a thumb on the scale in favor of one side or another when data is limited, A222, that is wrong too. The statutory text requires NMFS to assess the best available data to determine what is "*likely*" to occur to the species if the proposed action proceeds," 16 U.S.C. §1536(a)(2) (emphasis added)—as NMFS has previously recognized, *see* 84 Fed. Reg. at 44,992 ("In all instances, we will draw upon the best scientific and commercial data available *to determine if ... an activity is reasonably certain to occur*." (emphasis added)). And a substantive presumption "in favor of the species" is not "data" at all, let alone the "best scientific and commercial data"—if anything, it is the very opposite, as it causes the agency to skew data showing what is likely to occur to the species. Thus, when applying such an atextual presumption leads the agency to assess "worst case scenarios" that are concededly "very likely" to never occur, A926, the agency has violated the ESA's mandates twice over.

The district court also suggested in passing that NMFS' "policy" choice to examine the worst-case scenario is of no moment because the "best data" showed that scenario as within the "range of reasonably likely options." A222. The court

like the ESA itself) make clear that NMFS should examine reasonably likely scenarios, not worst-case ones.

cited nothing to support that dubious proposition, and understandably so. Unless disaster is more likely than not, the worst-case scenario is *unlikely* to occur—and in a situation like this, where various scenarios are distributed across the spectrum based on numerous highly variable factors (everything from calving rates to migration patterns to Canadian fishing practices)—the worst-case scenario lies at the extreme end of the bell curve, far removed from the likely scenarios in the middle. *See* 50 C.F.R. §402.17(b)(3) (explaining that agency should not consider a consequence that "is only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur"). Certainly nothing in the record here indicates that NMFS thought that the worst-case scenario that it examined is reasonably likely to occur. In fact, NMFS admitted that, as a "[c]onsequen[ce]" of "utilizing metrics representing the worst case scenario," its projections are "very likely" inaccurate—*i.e.*, "it is likely that the projections underestimate the likelihood of an increasing right whale population." A926, 937.

*   *   *

In sum, NMFS' theory that §7(a)(2) of the ESA requires it to apply a "worst case scenario" approach and a presumption "in favor of the species" is egregiously wrong. The statute, the implementing regulations, the statutory history, and Supreme Court precedent all make clear that NMFS should have focused on the

"data" showing "likely" scenarios. NMFS' refusal to do so at the expense of the most important industry in Maine suffices to reverse the decision below.

## II. NMFS Lacked Authority To Incorporate Its Draconian Conservation Framework Into The Proposed Agency Action.

NMFS' action here suffers from a second and interrelated legal defect: The agency failed to adhere to the procedural requirements set forth in the ESA. Like all administrative agencies, NMFS is a "creature[] of statute" and thus "possess[es] only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S.Ct. 661, 665 (2022). Here, however, NMFS imposed radical changes to existing conservation restrictions on the American lobster fishery without meaningfully testing their necessity or proportionality as Congress required.

### A. NMFS Unlawfully Circumvented the ESA's Meticulous Scheme for Imposing Conservation Requirements.

1. Section 7(a)(2) of the ESA provides two routes by which a consulting agency may impose conservation requirements when considering a proposed agency action that could harm a listed species. First, if the consulting agency issues a biological opinion that finds that a proposed agency action is likely to jeopardize the species, the consulting agency "shall suggest … reasonable and prudent alternatives" that would allow the action agency to avoid jeopardy. 16 U.S.C. §1536(b)(3)(A); *see Bennett*, 520 U.S. at 158. That authority is not *carte blanche* to impose the most stringent conservation measures that the consulting agency can conjure up to protect

the species even if unlikely scenarios come to pass.  To the contrary, a "reasonable and prudent alternative" is one that is "economically and technologically feasible." 50 C.F.R. §402.02.  And that requirement has teeth:  Courts have determined that the consulting agency's failure to evaluate its proposed alternative for economic and technological feasibility is itself arbitrary and capricious.  *See, e.g.*, *Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 474-75 (4th Cir. 2013).

Second, if the consulting agency issues a biological opinion that finds that a proposed agency action is not likely to jeopardize the species, but that the action will result in some incidental taking of the species, it must specify "reasonable and prudent measures" that are "necessary or appropriate" to "minimize such impact." 16 U.S.C. §1536(b)(4).  In that scenario, the ESA more strictly limits the kind of requirements that the agency may impose.  As the implementing regulations explain, "reasonable and prudent measures" "cannot alter the basic design, location, scope, duration, or timing of the action" and "may involve only minor changes."  50 C.F.R. §402.14(i)(2).  That requirement also has teeth:  Courts regularly set aside conservation restrictions that are "major" rather than "minor."  *See, e.g.*, *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1095-96 (D.C. Cir. 2021); *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 876 (9th Cir. 2004).

2. NMFS' action here is an obvious end-run around the ESA's considered scheme. Indeed, at the outset of the §7(a)(2) consultation process and before the issuance of a biological opinion, NMFS unilaterally determined that the "mandates of the ESA" "required" it to impose crippling restrictions on the lobster industry and so developed its draconian conservation framework. A1071, 1073. NMFS simply *assumed* on the front end of the process that economically debilitating conservation restrictions on the lobster fishery are necessary and then generated a biological opinion that did nothing but confirm that those extreme restrictions—untested for reasonableness or prudence—would not jeopardize the right whale. That approach makes a mockery of the congressional scheme, as it allows NMFS to entirely sidestep questions about whether the conservation framework is necessary to avoid likely jeopardy, a "reasonable and prudent alternative" (including whether it is "economically and technologically feasible"), *see* 16 U.S.C. §1536(b)(3)(A); 50 C.F.R. §402.02, or a "reasonable and prudent measure" (including whether it qualifies as only a "minor change" to the existing fishery), *see* 16 U.S.C. §1536(b)(4); 50 C.F.R. §402.14(i)(2).

Congress never conferred such sweeping power on NMFS in §7(a)(2) of the ESA—quite the opposite. Congress added the "reasonable and prudent" requirements to the ESA in 1978 as part of the immediate legislative backlash to judicial decisions interpreting the ESA to require the preservation of species

"whatever the cost." *Hill*, 437 U.S. at 184; *see* Pub. L. 95-632 §3, 95 Stat. 3751, 3752. The whole point of requiring the consulting agency to assess whether proposed conservation restrictions are "reasonable and prudent" is to ensure that the agency does *not* inflict any more economic disruption than is necessary to protect the species.[8] *See Bennett*, 520 U.S. at 176-77. If NMFS had limitless authority to impose the most unreasonable and imprudent conservations requirements at the outset of the process, it would render the "reasonable and prudent" language in the statute nugatory and result in precisely the sort of economic disruption that Congress sought to avoid.

NMFS' novel approach also collides with other features of the statutory scheme. Consider the detailed provisions regarding the Endangered Species Committee, which comprise the bulk of §7 of the ESA. *See* 16 U.S.C. §1536(e)-(p). Those provisions authorize the Committee—whose members include not only members of the President's Cabinet, like the "Chairman of the Council of Economic Advisors," but also "one individual from each affected State"—to provide an

---

[8] For instance, if an agency has multiple options to prevent likely jeopardy to the species and one of the options is reasonable and prudent and the other is not, the ESA requires the agency to choose the former. Thus, in this case, even assuming that NMFS could find that authorizing the American lobster fishery would likely jeopardize the right whale (it could not), NMFS had to assess whether its proposed requirements qualified as "reasonable and prudent." Had it done so, it would have had no choice but find that its industry-imperiling approach is neither reasonable nor prudent and would have had to consider whether less draconian restrictions suffice.

"exemption" from §7(a)(2)'s no-jeopardy mandate after the consulting agency issues a biological opinion that finds a likely threat of jeopardy to the species and that there are no reasonable and prudent alternatives available to avoid that likely threat. *See id.* §1536(e)(3), (h). That Committee must issue an exemption when, among other things, the proposed action is "of regional or national significance" and when the "benefits" of that action "clearly outweigh" the benefits of any alternatives. *Id.* §1536(h)(1)(A). In other words, the Committee-related provisions in the statute reinforce the idea "[t]hat economic consequences are an explicit concern of the ESA." *Bennett*, 520 U.S. at 177.

Quite obviously, however, if NMFS could impose economically ruinous conservation requirements at the outset of the consultation process to eliminate the possibility of a jeopardy opinion, the Committee and the economic policymakers who sit on it would *never* have any role to play. Indeed, the obvious design of the Committee—requiring high-ranking executive branch officials with economic responsibility and representatives from affected states to determine whether the benefits of the proposed agency action outweigh the harms—is to obtain accountability and "buy in" for difficult decisions when there are no reasonable and prudent avenues for reaching a no-jeopardy solution. Allowing NMFS to arrogate to itself the role of proposing unreasonable and imprudent measures upfront and then rubberstamping those draconian conditions as posing no jeopardy to the species,

with none of the accountability and buy-in provided by the Committee system, utterly defeats the carefully constructed statutory regime. Put differently, the ESA provides a specific mechanism for deciding "major questions," *see West Virginia*, 142 S.Ct. at 2607-09—*i.e.*, questions "of regional or national significance," 16 U.S.C. §1536(h)(1)(A). Congress did not leave it for NMFS to decide those questions for itself on the front end without meaningful testing on either the front or back ends.[9]

But that is exactly what NMFS did here. It manipulated the statutory scheme to impose a conservation framework that promises to destroy the American lobster fishery while bypassing the detailed provisions governing "reasonable and prudent measures" and "reasonable and prudent alternatives." This approach has no basis in the ESA.

### B.     The District Court's Contrary Conclusion Is Wrong.

The district court acknowledged that, through its discussion of "reasonable and prudent alternatives" and "reasonable and prudent measures," the ESA places "limits on the *consulting agency's*" authority to impose conservation restrictions in the biological opinion. A239 (emphasis added). But the court nevertheless concluded that NMFS permissibly incorporated the conservation framework into the

---

[9] Although NMFS is one of the parties that could file an application for an exemption with the Endangered Species Committee, other parties can do so too. *See* 16 U.S.C. §1536(g)(1).

proposed agency action because NMFS did so in its capacity as the *action agency*, and nothing in "any statute, regulation, or other legal rule limit[s] how an action agency may define the scope of its proposed action." A239.

That conclusion is fundamentally misguided as both a legal and factual matter. Just like any administrative agency, NMFS (regardless whether it is acting in its capacity as action agency or consulting agency) must point to explicit congressional authority to justify its conduct. *See NFIB*, 142 S.Ct. at 665. Thus, rather than ask whether any statute *limits* NMFS' authority to include needless and economically ruinous conservation requirements in its proposed action, the district court should have asked whether any statute *authorized* it to do so. No such statute exists. Indeed, the only statute that NMFS invoked below is §7(a)(2) of the ESA. *See* Dkt.48-2 at 40. But as the Supreme Court has already held, arguably the "primary" purpose of that provision "is to *avoid* needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett*, 520 U.S. at 176-77 (emphasis added). NMFS' action is obviously at cross-purposes with that provision. And the plain text of §7(a)(2) makes clear that it applies to both the action agency and the consulting agency alike. *See* 15 U.S.C. §1536(a)(2).

In all events, the district court's theory that NMFS included the conservation framework within the scope of the proposed action in its capacity as *action* agency

51

is incorrect.  When NMFS' Sustainable Fisheries Division (*i.e.*, the action agency) initiated formal consultation under §7(a)(2) of the ESA in October 2017, it never mentioned any conservation framework.  *See* A2118-24.  In fact, the administrative record unmistakably demonstrates that NMFS' Protected Resources Division (*i.e.*, the consulting agency) developed the framework and included it in the proposed agency action itself.  A memorandum written by the Protected Resources Division in October 2020 (less than three months before NMFS issued its draft biological opinion) confirms as much.  The memorandum states that "we"—meaning the Protected Resources Division—"developed an option (referred to as the Conservation Framework) which would set targets for reducing serious injury and mortality of right whales in the federal fisheries and be considered as part of the proposed action."  A447.  The "draft Conservation Framework was developed by staff in PRD given their expertise."  A447.  The Protected Resources Division then included that conservation framework in the proposed action before asking the Sustainable Fisheries Division to concur in that decision in May 2021—four months *after* issuing the draft biological opinion.  A531.  Thus, even accepting the district court's erroneous view that an action agency can impose draconian conservation restrictions to its heart's content when defining the proposed action, the district court still erred, as the record confirms that the consulting agency imposed the

52

conservation framework here. Even the court below seemed to agree that there is no statutory authority for that novel maneuver.

### III. The Court Should Order A Remand To NMFS Without Vacatur.

As the foregoing demonstrates, NMFS' action here is (at a minimum) doubly inconsistent with the ESA. Although "the ordinary practice is to vacate unlawful agency action," that is not an inexorable command. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). For good reason: "Vacatur itself carries *more-harmful* consequences" in certain cases. *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016) (emphasis added).

That is the situation here, which is why MLA has never sought vacatur. Indeed, as NMFS itself has asserted, vacatur of the biological opinion could result in the closure of the entire lobster fishery because it would leave the agency in noncompliance with its §7(a)(2) duty to "insure" that authorizing the fishery "is not likely to jeopardize" the right whale. *See* Dkt.228 at 4, *Ctr. for Biological Diversity v. Raimondo*, No. 18-112 (D.D.C. filed Sept. 19, 2022) ("The federal lobster industry … could be closed if NMFS does not have an operable biological opinion in place to satisfy its ESA Section 7 legal requirements."). Vacatur here thus would amount to "an invitation to chaos." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). Because Maine's lobster industry (and the entire state) has suffered enough already, the Court should reverse and simply order a

remand to the agency to assess whether authorizing the American lobster fishery would likely jeopardize the right whale without speculating about "worst case scenarios," or putting a thumb on the scale "in favor of the species" and against the hardworking men and women of Maine's iconic lobster industry.

## CONCLUSION

The Court should reverse the district court's judgment and order a remand to NMFS without vacatur.

Respectfully submitted,

MARY ANNE MASON
Chief Legal Officer
MAINE LOBSTERMEN'S ASSOCIATION
2 Storer St., Suite 203
Kennebunk, ME 04043

JANE C. LUXTON
LEWIS BRISBOIS BISGAARD & SMITH
2112 Pennsylvania Ave., Suite 500
Washington, DC 20037

RYAN STEEN
JASON MORGAN
JAMES FELDMAN
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ANDREW C. LAWRENCE[*]
JAMES Y. XI[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellant*

November 9, 2022

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(e) because it contains 12,957 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

November 9, 2022

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 9, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**ADDENDUM**

# TABLE OF CONTENTS

16 U.S.C. §1536……………………………………………………..……A1

50 C.F.R. §402.02…………………………………………………………...A7

50 C.F.R. §402.14…………………………………………………………...A8

50 C.F.R. §402.17………………………………………………………….A12

i

**16 U.S.C. §1536.  Interagency cooperation**

**(a) Federal agency actions and consultations**

…

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

…

(4) Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 1533 of this title or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

**(b) Opinion of Secretary**

…

(3)(A) Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

…

(4) If after consultation under subsection (a)(2), the Secretary concludes that—

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

…

**(e) Endangered Species Committee**

(1) There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

(2) The Committee shall review any application submitted to it pursuant to his section and determine in accordance with subsection (h) of this section whether or

A2

not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

(3) The Committee shall be composed of seven members as follows:

(A) The Secretary of Agriculture.

(B) The Secretary of the Army.

(C) The Chairman of the Council of Economic Advisors.

(D) The Administrator of the Environmental Protection Agency.

(E) The Secretary of the Interior.

(F) The Administrator of the National Oceanic and Atmospheric Administration.

(G) The President, after consideration of any recommendations received pursuant to subsection (g)(2)(B) shall appoint one individual from each affected State, as determined by the Secretary, to be a member of the Committee for the consideration of the application for exemption for an agency action with respect to which such recommendations are made, not later than 30 days after an application is submitted pursuant to this section.

…

**(g) Application for exemption; report to Committee**

(1) A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action would violate subsection (a)(2). An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5). The applicant for an exemption shall be referred to as the "exemption applicant" in this section.

(2)(A) An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license. For purposes of the preceding sentence, the term "final agency action" means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review. Such application shall set forth the reasons why the exemption applicant considers that the agency action meets the requirements for an exemption under this subsection.

(B) Upon receipt of an application for exemption for an agency action under paragraph (1), the Secretary shall promptly (i) notify the Governor of each affected State, if any, as determined by the Secretary, and request the Governors so notified to recommend individuals to be appointed to the Endangered Species Committee for consideration of such application; and (ii) publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed.

(3) The Secretary shall within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary—

(A) determine that the Federal agency concerned and the exemption applicant have—

(i) carried out the consultation responsibilities described in subsection (a) in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2);

(ii) conducted any biological assessment required by subsection (c); and

(iii) to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d); or

(B) deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii).

The denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of title 5.

(4) If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of title 5 and prepare the report to be submitted pursuant to paragraph (5).

(5) Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit to the Committee a report discussing—

(A) the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

(B) a summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance;

(C) appropriate reasonable mitigation and enhancement measures which should be considered by the Committee; and

(D) whether the Federal agency concerned and the exemption applicant refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

A5

…

**(h) Grant of exemption**

(1) The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—

(A) it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—

(i) there are no reasonable and prudent alternatives to the agency action;

(ii) the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

(iii) the action is of regional or national significance; and

(iv) neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

(B) it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.

Any final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of title 5.

…

**50 C.F.R. §402.02 Definitions.**

…

*Cumulative effects* are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

…

*Effects of the action* are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See § 402.17).

…

*Jeopardize the continued existence of* means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

…

*Reasonable and prudent alternatives* refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

*Reasonable and prudent measures* refer to those actions the Director believes necessary or appropriate to minimize the impacts, *i.e.,* amount or extent, of incidental take.

**50 C.F.R. §402.14 Formal consultation.**

…

(g) *Service responsibilities.* Service responsibilities during formal consultation are as follows:

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g)(1) through (3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45-day period in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45-day or extended deadline while the draft is

under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10-day extension on the deadline.

(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

(7) Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.

(h) *Biological opinions.* (1) The biological opinion shall include:

(i) summary of the information on which the opinion is based;

(ii) A detailed discussion of the environmental baseline of the listed species and critical habitat;

(iii) detailed discussion of the effects of the action on listed species or critical habitat; and

(iv) The Service's opinion on whether the action is:

(A) Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy" biological opinion); or

(B) Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion).

(2) A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, the Service will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

…

(i) *Incidental take.* (1) In those cases where the Service concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, the Service will provide with the biological opinion a statement concerning incidental take that:

(i) Specifies the impact, *i.e.,* the amount or extent, of such incidental taking on the species (A surrogate (*e.g.,* similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level ii anticipated take has been exceeded.);

(ii) Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact;

(iii) In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;

(iv) Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or

any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (i)(1)(iii) of this section; and

(v) Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

(2) Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes.

…

**50 C.F.R. §402.17 Other provisions.**

(a) *Activities that are reasonably certain to occur.* A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Factors to consider when evaluating whether activities caused by the proposed action (but not part of the proposed action) or activities reviewed under cumulative effects are reasonably certain to occur include, but are not limited to:

(1) Past experiences with activities that have resulted from actions that are similar in scope, nature, and magnitude to the proposed action;

(2) Existing plans for the activity; and

(3) Any remaining economic, administrative, and legal requirements necessary for the activity to go forward.

(b) *Consequences caused by the proposed action.* To be considered an effect of a proposed action, a consequence must be caused by the proposed action (*i.e.,* the consequence would not occur but for the proposed action and is reasonably certain to occur). A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Considerations for determining that a consequence to the species or critical habitat is not caused by the proposed action include, but are not limited to:

(1) The consequence is so remote in time from the action under consultation that it is not reasonably certain to occur; or

(2) The consequence is so geographically remote from the immediate area involved in the action that it is not reasonably certain to occur; or

(3) The consequence is only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur.

(c) *Required consideration.* The provisions in paragraphs (a) and (b) of this section must be considered by the action agency and the Services.